IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TYREE TALLEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:21-CV-249-RP |
| | § | |
| CITY OF AUSTIN, et al., | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER</u>

Before the Court is Defendant City of Austin's ("the City") Motion for Summary Judgment,

(Dkt. 130), and Motion to Strike Plaintiff's Summary Judgment Evidence, (Dkt. 146). Also before

the Court is Defendants Benjamin Lynch, Gadiel Alas, Timothy Cobaugh, Darrell Cantu-Harkless,

Joseph Hethershaw, Gregory Cherne, and Justin Wright's ("Officer Defendants"), Motion for

Summary Judgment, (Dkt. 132).[1] Finally before the Court is Plaintiff and the Officer Defendants'

joint motion to consolidate this case with Cause No. 1:21-cv-1087 for trial. (Dkt. 163). In Cause No.

1:21-cv-1087, a different plaintiff, Modesto Rodriguez, sued common defendants for similar alleged

constitutional violations, based on similar facts. (*See id.*). That case was consolidated with this one for

---

[1] Defendants filed these motions in response to Plaintiff's first amended complaint, (*see* 1st Am. Compl., Dkt. 76). The Court has since granted Plaintiff leave to file a second amended complaint, which removes Plaintiff's claims under the Americans with Disabilities Act ("ADA"), Rehabilitation Act ("RA"), and First Amendment. (Order, Dkt. 161). Plaintiff's sole purpose for amending was to "promote[] judicial economy by narrowing the summary judgment issues before the Court." (*Id.* at 2). The second amended complaint incorporates the first amended complaint. (*See* 2d Am. Compl., Dkt. 162, at 2). The Fifth Circuit has indicated that if an amended complaint successfully incorporates an earlier complaint, the earlier complaint is not nullified. *See New Orleans Ass'n of Cemetery Tour Guides & Companies v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1033–34 (5th Cir. 2023); *see also* Order, Dkt. 161 (concluding that granting Plaintiff's motion for leave to file a second amended complaint does not prevent Defendants from appealing the Court's August 14, 2024 order denying their previous motion to dismiss the first amended complaint, which argued that Plaintiff was time-barred from suing the Officer Defendants). Therefore, the Court finds that the second amended complaint does not moot the motions for summary judgment or the motion to strike.

discovery purposes. (*Id.*). Having reviewed the record, the parties' briefing, and the relevant law, the Court will deny the motion to strike, grant the motions for summary judgment, and moot the motion to consolidate cases for trial.

## I. BACKGROUND

### A. Underlying Events

This case concerns the shooting of Plaintiff with kinetic energy projectiles—referred to by Defendants as "less lethal" beanbag rounds—outside the Austin Police Department ("APD") headquarters during a protest on May 30, 2020. (2d Am. Compl., Dkt. 162, at 4). Though Defendants admit that many of the protestors were peaceful, they argue that others "threw countless projectiles at APD officers that included rocks, bottles, backpacks, incendiary fireworks, broken pieces of concrete, frozen water bottles, bottles filled with urine, and a Molotov cocktail, and also committed arson." (City's Mot. Summ. J., Dkt. 132, at 5). Defendants identify the I-35 overpass near the APD station, where these events took place, as the "epicenter of violence." (*Id.*). Plaintiff disputes this characterization, arguing that the evidence fails to show any "discernible epicenter," and the actions in the video footage do not constitute any "significant" amount of "violent acts." (Resp. Officer Defs. Mot. Summ. J., Dkt. 139, at 7).

At the scene, APD placed officers in two lines—one in front of the station and the other on the I-35 overpass, overlooking protestors. (*Id.*). The officers were armed with beanbag rounds. (*Id.*). Leading up to Plaintiff's throw, video evidence shows officers congregated around a vehicle that had driven into the crowd. (Officer Defs. Mot. Summ. J., Dkt. 132, at 7). The car drove away in reverse, leaving the officers in the middle of the service road among the protestors. (*Id.* at 8). Protestors began throwing objects on and around the officers from multiple directions—including from under the overpass. (*Id.*). Video then shows Plaintiff's friend, Modesto Rodriguez, pick something up off

the ground and hurl it toward police. (*Id.*). Minutes later, another protestor threw an incendiary device, which landed near the officers' feet and caused the crowd to scatter. (*Id.*).

Moments later, Plaintiff ran from underneath the I-35 overpass and hurled a projectile in the direction of the officers. (*Id.*). The object was later revealed to be an empty water bottle. (Resp. Officer Defs. Mot. Summ. J., Dkt. 139, at 8). After throwing the bottle, Plaintiff turned to retreat to the overpass, but was hit by beanbag rounds before he could reach it. (Officer Defendants' Mot. Summ. J., Dkt. 132, at 9). Video does not show the Officer Defendants issuing either a warning or a dispersal order before deploying the beanbag rounds. (Resp. Officer Defs. Mot. Summ. J., Dkt. 139, at 6). Defendant Wright explained that, from his perspective, deployment of the beanbag rounds was justified because Plaintiff had followed a pattern that he observed from other nonpeaceful protestors, whereby protestors would "run out from under the overpass, throw objects at officers, run back under the overpass and then repeat the process." (City's Mot. Summ. J, Dkt. 130, at 4).

After the beanbag rounds impacted him, Plaintiff collapsed to the ground and curled into a fetal position. (Resp. Officer Defs. Mot. Summ. J., Dkt. 139, at 6). Police continued to fire rounds at him, ultimately shooting him twelve times throughout his body, including shots to his ear, arm, groin, and legs. (*Id.*). Some shots came from 65 to 80 feet away, outside of the beanbag-round manufacturer's recommended effective range of 20 to 50 feet and, in some cases, more than the manufacturer's maximum effective range of 75 feet. (*Id.* at 20).

### B.  City of Austin Policies

#### 1. Use of Beanbag Rounds on May 30

During the May 30 protest, APD directed its officers to use beanbag rounds against protestors in certain circumstances. APD Policy 206.5.3 provides:

> 206.5.3 EXAMPLES OF CIRCUMSTANCES APPROPRIATE
> FOR DEPLOYMENT

Examples include, but are not limited to, the following types of situations where the subject:
(a) Is armed with a weapon and the tactical circumstances allow for the safe application of approved munitions.
(b) Has made credible threats to harm himself or others.
(c) Is engaged in riotous behavior or is throwing rocks, bottles or other dangerous projectiles at people and/or officers, creating a risk for injury.
(d) There is reasonable suspicion to believe that the subject has already committed a crime of violence and is refusing to comply with lawful orders.

(City's Mot. Summ. J., Dkt. 130, at 13). Policy 206.5.4, in turn, lists several considerations that

officers are to consider before deploying less-lethal munitions.

206.5.4 ADDITIONAL DEPLOYMENT CONSIDERATIONS

(a) Before discharging projectiles, the officer should consider the following factors:
1. The subject's capability to pose an imminent threat to the safety of officers or others.
2. Whether the subject is actively resisting arrest or attempting to evade arrest by flight.
3. The credibility of the subject's threat as evaluated by the officers present, and the subject's physical capacity/capability to carry out the threat.
4. The availability of other force options and their possible effectiveness.
5. Distance and angle to target.
6. Type of munitions employed.
7. Type and thickness of subject's clothing.
8. The subject's actions dictate the need for an immediate response and the use of control devices appears appropriate

(*Id.*). APD then-Chief Brian Manley announced that the Officer Defendants' use of beanbag rounds

met these policy criteria. (Resp. City's Mot. Summ. J., Dkt. 138, at 15).

Plaintiff also alleges the City failed to remove expired rounds from circulation within the

department and that some of the rounds fired at Talley were likely expired. (*Id.* at 8). Evidence

suggests that time and/or exposure to Texas heat can cause the munitions to harden. (*Id.*). Plaintiff

4

Case 1:21-cv-00249-RP    Document 167    Filed 12/17/24    Page 5 of 33

argues that the rounds hardened over time and inflicted more extensive injuries to Plaintiff than they would have otherwise. (*Id.* at 24).

### 2. APD Training

APD trains officers on how to use beanbag rounds. (*Id.* at 8). Training materials on the shotguns, which are shown during the academy, include identification of preferred target areas, acceptable target areas, and target areas to avoid, unless deadly force is warranted, due to their potential for serious injury or death. (*Id.*). These areas are identified as zones, either green, yellow, and red, respectively. (*Id.*).

In terms of practical training, officers have four opportunities to fire the weapon at the police academy (two shots each from two different distances—20 feet and 40 feet). (*Id.*). To continue to "qualify" with the weapons, officers annually fire the shotguns four times at designated distances, the longest being 40 feet. (*Id.*). The department does not order additional rounds for independent range training. (*Id.*).

### C. Procedural History

Plaintiff filed suit on March 15, 2021, against the City of Austin and as-yet unnamed "John Doe" officers. (*See* Compl., Dkt. 1, at 1). His claims included violations of his First, Fourth, and Fourteenth Amendment rights under 42 U.S.C. § 1983, violations of the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"), and negligence. (*Id.* at 12–16). Plaintiff named the Officer Defendants in an amended complaint on September 14, 2024. (1st Am. Compl., Dkt. 77). Both the City and the Officer Defendants subsequently filed their motions for summary judgment, (City's Mot. Summ. J., Dkt. 130; Officer Defs. Mot. Summ. J., Dkt. 132), and the City also filed a motion to strike Plaintiff's summary judgment evidence. (Mot. Strike, Dkt. 146). To narrow the

issues before the Court, Plaintiff removed his ADA/RA and First Amendment claims in a second amended complaint filed on November 20, 2024. (2d. Am. Compl., Dkt. 162).

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to

"sift through the record in search of evidence" to support the nonmovant's opposition to the

motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a

genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will

be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

The qualified immunity defense changes the usual summary judgment burden of proof.

*Baker v. Coburn*, 68 F.4th 240, 244 (5th Cir. 2023). "Once an official pleads the [qualified immunity]

defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine

fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.*

(citation omitted). Courts also assign greater weight to the video recordings taken at the scene. *Id.*

(quoting *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022)). But a court "should not discount the

nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury

could not believe his account." *Id.* at 250 n.9 (quoting *Darden v. City of Fort Worth*, 880 F.3d 722, 727

(5th Cir. 2018)).

## III. DISCUSSION

### A. Motion to Strike

The City objects to Plaintiffs' summary judgment evidence under Federal Rules of Evidence

401-403, 801-802, and 805. (Mot. Strike, Dkt. 146, at 1). The evidence at issue is a compilation of

text messages from May 30, 2020, shared in a group chat between then-Assistant City Manager Rey

Arellano, then-City Manager Spencer Cronk, then-APD Chief Manley, and then-city

councilmembers, mayor, and other officials. (*Id.*). The first text was sent from a councilmember who

"attach[ed] disturbing reports and photos from today" that purportedly show "the City escalating

situations unnecessarily which creates more risk for officers and residents." (Dkt. 138-15, at 1). He

shared other text threads, a GoFundMe page, and a Facebook post with anecdotes of police officers

inflicting injuries on peaceful protestors. (*Id.* at 2–4). Most of these anecdotes were not attributed to named sources. The councilmember urged Chief Manley, the Mayor, and City Manager to "redouble [their] efforts to reduce needless escalations and also make sure everyone is safe." (*Id.*).

Later in the text thread, another councilmember said, "Good morning, yesterday I sent a text asking for a summary of arrests and major incidences" and asked when she should expect to receive it. (*Id.*). Arellano responded, "Good morning," and responded that he would send a summary by "noon today." (*Id.*).

The City argues that the text messages contain hearsay which is inadmissible under Rule 802 as well as hearsay within hearsay which is inadmissible under Rules 802 and 805. (Mot. Strike, Dkt. 146, at 1). The City additionally argues that the messages contain unsworn commentary by both known and unknown senders which, besides being hearsay, is also inadmissible because it is irrelevant under Rule 402, or alternatively, under Rule 403 because its probative value is substantially outweighed by the danger of unfair prejudice. (*Id.*). Finally, the City notes that the texts do not include time stamps or references to when the incidents took place. (*Id.* at 2–3). They are therefore irrelevant as to when Chief Manley or the City were put on notice.

The Court finds that the City's arguments are without merit. First, the text messages do not include hearsay because, although they contain out of court statements, Plaintiff does not offer those statements to prove the truth of the matter asserted. Fed. R. Evid. 801(d). Plaintiff merely cites the text messages to show Chief Manley's awareness of the events of May 30 before Plaintiff was shot. (*See* Resp. City's Mot. Summ. J., Dkt. 138, at 16). Whether the events in the texts actually took place has no bearing on this proceeding.

Second, although the texts lack time stamps or references as to when events took place, the Court finds them relevant on notice. Mid-way through the text thread, a city councilmember and

Arellano both greet each other with "good morning." (Dkt. 138-15, at 4). This message, and every message that came before it (which include every report of alleged violence except for the Facebook post), was necessarily sent to the text group before noon on May 30, 2020, at least nine hours before Plaintiff was shot. By establishing that Chief Manley received messages complaining of Austin police conduct before noon on May 30, the texts support Plaintiff's argument that the City knew of potential police violence against protestors. (*See* Resp. City's Mot. Summ. J., Dkt. 138, at 16). The identity of the senders is immaterial. The texts are therefore relevant under Rule 401.

Third, Rule 403 does not apply at the summary judgment stage. *Cf. Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981) (holding that concerns over undue prejudice under Federal Rule of Evidence 403 have "no logical application to bench trials.") "Rule 403 assumes a trial judge can discern and weigh the improper inferences that a jury might draw from certain evidence, and then balance those improprieties against probative value and necessity." *Id.* The judge can also exclude those improper inferences from their mind in deciding a motion for summary judgment. Accordingly, the Court denies the City's motion to strike Plaintiff's summary judgment evidence.

### B. Officer Defendants' Motion for Summary Judgment

"To determine whether a government official is entitled to qualified immunity for an alleged constitutional violation, [courts] conduct [the] two-step analysis of *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)." *Lytle v. Bexar Cty.*, 560 F.3d 404, 409 (5th Cir. 2009) (internal citations omitted). First, the Court must "ask the threshold constitutional violation question of whether, taking the facts in the light most favorable to the plaintiff, the officer's alleged conduct violated a constitutional right." *Id.* at 409–10. If the officer violated a constitutional right, the Court must then "ask the 'qualified immunity question' of whether the right was clearly established at the

time of the conduct." *Id.* The Court will first address whether the Officer Defendants violated

Plaintiff's constitutional rights, then discuss whether they are entitled to qualified immunity.

1. Constitutional Violation

a. Seizure

The first question is whether the Officer Defendants' conduct amounted to a Fourth

Amendment seizure. "[W]here a plaintiff raises potential violations under the Fourth and Fourteenth

Amendments, a Court should first consider whether the claim falls within the ambit of the Fourth

Amendment—that is, whether it arises in the course of an arrest, investigatory stop, or other seizure

of a free citizen. If so, the claim should be analyzed under Fourth Amendment jurisprudence."

*Campbell v. City of Indianola*, 117 F.Supp.3d 854 (N.D. Miss. 2015) (citing *Graham v. Connor*, 490 U.S.

386, 393–94 (1989)). "If not, the claim should be analyzed as a due process violation under the

Fourteenth Amendment." *Id.* (citing *Petta v. Rivera*, 143 F.3d 895, 911 n.25). The Officer Defendants

argue that this case does not fall within the Fourth Amendment's ambit because "the Officer

Defendants' intent was only to disperse violent rioters from within the protest crowds," not to seize

Plaintiff. (Officer Defs. Mot. Summary Judgment, Dkt. 132, at 10).

A person is seized by police when the officer uses "physical force" to "terminate or

restrain . . . movement . . . through means intentionally applied." *Brendlin v. California*, 551 U.S. 249,

254 (2007) (internal citations and quotation marks omitted) (emphasis omitted). Here, Talley fell to

the ground shortly after the beanbag rounds impacted him. (Resp. Officer Defs.' Mot. Summ. J.,

Dkt. 139, at 13). He stayed in a fetal position as more projectiles impacted him, unable to leave the

scene. (*Id.*). The conduct constitutes a seizure within the meaning of the Fourth Amendment.

The Officer Defendants argue that they did not deploy beanbags intending to arrest or

restrain protestors. (*Id.*). Rather, the Officer Defendants argue that the rounds were meant to

disperse violent agitators and "stop their immediate action[s]." (*Id.*). Plaintiff contends that, instead of dispersing protestors, the Officer Defendants meant to "incapacitate and control" them. (*Id.* at 8).

Viewed in the light most favorable to Plaintiff, the evidence indicates that the Officer Defendants did not manifest an objective intent to disperse Talley and other allegedly violent protestors. At the very least, a reasonable jury could conclude that they meant to restrain him rather than force him to retreat or move away. The Officer Defendants issued no dispersal order or other warning to Plaintiff, and they shot him after he had already begun to retreat to the overpass. (*Id.* at 6, 14).[2] The Officer Defendants' shots caught him in between two police lines, rather than forcing him in a particular direction. (*Id.* at 6). Nor do the Officer Defendants' weapons manifest an objective intent to disperse—the Austin Police Department "Control Devices and Techniques" General Order 206 states "Kinetic Energy Projectiles and their delivery systems" may be used "[w]hen a decision has been made to control, restrain or arrest a violent, threatening or escaping subject . . . ." (*Id.*). Because beanbags are used to "control, restrain or arrest" subjects under APD's own policy, the Court finds a genuine dispute of material fact as to whether the Officer Defendants objectively meant to restrain or disperse.

The Officer Defendants' argument that "no reasonable jury could conclude that the Officer Defendants were attempting to arrest rather than disperse" the crowd incorrectly assumes that a seizure requires an arrest. (*See* Officer Defs. Mot. Summary Judgment, Dkt. 132, at 14). In support of their motion, the Officer Defendants argue that "[n]o officer ever made any attempt to arrest"

---

[2] The Officer Defendants cite *Perkins v. City of Des Moines*, 2024 WL 756283 (S.D. Iowa 2024), as a case where the court found that "no reasonable jury could conclude an objective intent to restrain" the plaintiff and therefore concluded that police officers had not seized the plaintiff. (Officer Defs. Mot. Summary Judgment, Dkt. 132, at 11–12). But that case is distinguishable because Perkins was instructed to "move along" and had been specifically instructed to leave the area. *Id.* at *9 (alterations omitted). Here, the Officer Defendants issued no such warnings.

Plaintiff, and "[e]ach officer had already spent hours attempting to disperse violent agitators from the crowd" without arresting them. (*Id.*). However, an ensuing arrest is not a prerequisite to a finding that a seizure has occurred. For example, in *Brower v. County of Inyo*, the Supreme Court held that a seizure occurred when police blocked the roadway with a tractor-trailer. 489 U.S. 593 (1989); *see also Scott v. Harris*, 550 U.S. 372, 384 n.10 ("The only question in *Brower* was whether a police roadblock constituted a seizure under the Fourth Amendment."). And in *Graham v. Connor*, the Supreme Court held that a seizure occurred when officers "cuffed [plaintiff's] hands tightly behind his back," carried him to the patrol car, drove him home and released him. 490 U.S. 386, 393–94. As here, the plaintiff was not charged or prosecuted, and he was released. The Officer Defendants could have seized Plaintiff even if they did not intend to arrest him, and a reasonable jury may very well find that they did. Accordingly, the Court declines to grant summary judgment as to whether a seizure occurred.

### b. Constitutionality of Seizure

"To determine whether a seizure was objectively reasonable, and thus whether an injury is cognizable, we ask 'whether the totality of circumstances justified [that] particular sort of [] seizure.'" *Flores v. City of Palacios*, 381 F.3d 391, 398 (5th Cir. 2004 ((citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). "[T]he reasonableness of official use of force turns on a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 626 (5th Cir. 2006). "In assessing the government interest at stake, [courts] are guided by the '*Graham* factors,' which 'include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [he] was actively resisting arrest or attempting to evade arrest by flight.'" *Deshotels v. Marshall*, 454 Fed. Appx. 262, 267 (5th Cir. 2011) (citing *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 487 (5th Cir. 2001)." "The standard is objective reasonableness under

the totality of circumstances." *Byrd v. City of Bossier*, 23 F. Supp. 3d 665, 670 (W.D. La. 2014) (citing *Graham*, 490 U.S. at 396). "The relevant law . . . does not require the court to determine whether an officer was in actual, imminent danger of serious injury, but rather, whether the officer reasonably believed that the suspect posed a threat of serious harm to the officer or others." *Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (quoting *Rockwell*, 664 F.3d at 991). While the *Graham* factors are illustrative of "the types of objective circumstances potentially relevant to a determination of excessive force," the Supreme Court does "not consider this list to be exclusive." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

First, the severity factor weighs against granting summary judgment. The Officer Defendants argue that "Plaintiff committed the serious crime of knowingly participating in a riot, which scales up to the level of any other crime are committed by the other rioters." (Officer Defs. Mot. Summary Judgment, Dkt. 132, at 20). Crimes committed by other protestors allegedly included "throw[ing] countless rocks and other dangerous projectiles . . . leading up to the incident, which constitutes a first degree felony of Assault of Public Servant." (*Id.*). However, viewed in the light most favorable to Plaintiff, there remain genuine disputes of fact as to whether the Officer Defendants reasonably believed that (1) a riot occurred; and (2) Plaintiff knowingly participated in it. On the first point, Plaintiff alleges that the "video evidence shows a largely non-violent protest." (Resp. Officer Defs. Mot. Summary Judgment, Dkt. 139, at 6). In his deposition, Chief Robert Henderson conceded the protest at that time was not a "riot." (*Id.*). As to the second point, Plaintiff denies that the protest constituted a riot and that he presented any particularized danger to the officers. (*Id.* at 8). Given these disputed facts, a reasonable jury could conclude that the Officer Defendants' belief in the severity of Plaintiff's crime was unreasonable, and that whatever crimes he committed—if any at all—were insufficiently serious to justify the Officer Defendants' use of force.

The Officer Defendants also argue that a reasonable officer could believe that Plaintiff committed the "violent felony Assault of a Public Servant." (*Id.* at 16). But the felony requires that the alleged crime be committed with a "deadly weapon" under Texas Penal Code Section 22.02(a)(2). A reasonable officer may have known that a water bottle does not constitute a deadly weapon. Even if other protestors threw deadly weapons, a reasonable jury could decide that Plaintiff's alleged crime should not be scaled up to that of other protestors, especially when no "direct evidence" ties Talley to the actions of other protestors. (*Id.*). Because factual disputes remain as to whether the Officer Defendants reasonably believed that Plaintiff had committed a serious crime, summary judgment is not appropriate on the first *Graham* factor.

On the second *Graham* factor, a jury could conclude that Plaintiff did not pose an immediate threat to the safety of the officers. Defendants compare this case to *McVae v. Perez*, where this Court held that the plaintiff's act of throwing a rock at an officer tilted the *Graham* test in the police's favor. *See McVae v. Perez*, No. 5:21-CV-366-DAE, 2023 WL 6442930, at *4-5 (W.D. Tex. Sept. 12, 2023). The Court found this to be true even though the suspect was shot when he was no longer holding a rock and was running away from the officer. *Id.* at *6. Here, however, Plaintiff did not throw a rock or other dangerous object. Although it is unclear from the video evidence whether the Officer Defendants recognized the object was an empty water bottle, a reasonable jury could conclude that the Officer Defendants could see the object or could assume what it was.

Even if the Officer Defendants did not know what Plaintiff had thrown, Chief Robin Henderson has cast doubt on their justification for shooting Plaintiff if they "could not see whether the object he threw was capable of causing harm." (*Id.* at 17) ("I can't say that they would be [justified] if they can't discern whether or not that object is capable of inflicting harm"). This case can be distinguished from *McVae*, where the police officer knew that the suspect had thrown a rock,

14

and there were other rocks available on the ground for the suspect to pick up and use again. *See McVae*, 2023 WL 6442930, at *5. In that case, the Plaintiff had just thrown a heavy and dangerous object, and the police officer reasonably feared that he remained in danger. Here, however, the Officer Defendants either did not know what Plaintiff had thrown or knew that it was an empty water bottle with a low likelihood of inflicting harm. Under these circumstances, a jury could conclude that the Officer Defendants did not reasonably believe that Plaintiff posed an immediate threat. Even if the Officer Defendants at whom Plaintiff threw the water bottle reasonably believed he presented a threat, because the Officer Defendants on the I-35 overpass were outside the range of Plaintiff's throw, it is unclear whether a jury would find the same to be true for them. (Resp. Officer Defs. Mot. Summary Judgment, Dkt. 139, at 18).

Lastly, disputes remain as to whether Plaintiff reasonably posed a threat after he had already collapsed to the ground. The relevant timeframe for assessing the reasonableness of a threat is at the time of the threat, not afterwards. *See Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014). A jury could conclude that the Officer Defendants' continued shooting of Plaintiff after he had already fallen into a fetal position, seemingly unable to pick up other objects to throw, was not reasonable. (Resp. Officer Defs. Mot. Summary Judgment, Dkt. 139, at 19). The Court finds that the second *Graham* factor tilts against granting summary judgment.

The third and final *Graham* factor—that Plaintiff was fleeing arrest—similarly weighs against granting the motion for summary judgment. In order to evade arrest, Talley would have to subjectively believe that he was going to be arrested. However, "[n]o attempts were made to arrest anyone milling around the intersection—throwers or non-throwers." (*Id.* at 19). Given that no officer had attempted arrests, it is unclear whether Plaintiff (1) was aware that the Officer Defendants were going to arrest him and (2) thereafter took flight to avoid the arrest. The Officer

Defendants argue that they "were not impacting Plaintiff to arrest . . . but nonetheless Plaintiff could be said from the perspective of a reasonable officer as fleeing after committing one or more felony offenses." (Officer Defs. Mot. Summ. J., Dkt. 132, at 22). Even if this were true, a reasonable jury could find the Officer Defendants' use of multiple beanbag rounds unreasonable, especially after Talley had already fallen. Viewed in the light most favorable to Plaintiff, the evidence reveals genuine disputes of material fact as to whether the Officer Defendants violated Plaintiff's Fourth Amendment rights.

c. Individual Officer Liability

The Officer Defendants argue that there are "unanswered questions" as to when they fired their weapons, how many times each fired, how many times "any given Officer Defendant actually impacted Plaintiff," where on Talley's body each beanbag round struck, and if any Officer Defendant impacted Talley "at all." (*Id.* at 18).

The Officer Defendants cite *Epps v. City and County of Denver*, where a Colorado District Court, in a similar protest case, granted summary judgment in favor of officers after determining that the plaintiff had not "establish[ed] which defendant caused plaintiff's injury." No. 20-CV-01878, 2022 WL 523431, at *3 (D. Colo. Feb. 22, 2022). In that case, the plaintiff offered two chains of logic to support liability. First, Plaintiff proposed that "1) [plaintiff] was shot by bean bag rounds; (2) the [] deputies were shooting bean bag rounds; (3) other officers were not shooting bean bag rounds; (4) therefore, one or both of the [] deputies shot [plaintiff]." Alternatively, the plaintiff explained that "1) [plaintiff] was shot after kicking a cannister; (2) the [] deputies shot individuals kicking cannisters; (3) no other officers reported shooting individuals kicking cannisters; (4) therefore, one or both of the [] deputies shot [plaintiff]." *Id.* The court concluded that these chains of logic merely "narrow[ed] the list of suspects to deputies," but did not "sufficiently identif[y] the

officer or officers who shot plaintiff." *Id.* In contrast, Plaintiff in this case, viewing the evidence in

the light most favorable to him, has identified the shooting officers through his expert and the video

footage. The jury is therefore able to hold each Officer Defendant liable for Plaintiff's injuries.

### d. Qualified Immunity

After denying summary judgment as to whether the Officer Defendants violated Plaintiff's

Fourth Amendment right, the next question is whether "whether the right was clearly established at

the time of the conduct." *Id.* The doctrine of qualified immunity shields officials from civil liability

as long as their conduct "does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation

and quotation marks omitted).

> "Clearly established" means that, at the time of the officer's conduct,
> the law was sufficiently clear that every reasonable official would
> understand that what he is doing is unlawful. In other words, existing
> law must have placed the constitutionality of the officer's conduct
> beyond debate. This demanding standard protects all but the plainly
> incompetent or those who knowingly violate the law.

*D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up). There need not be a "case directly on point,

but existing precedent must have placed the statutory or constitutional question beyond debate."

*Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted). The focus of the inquiry is whether the

officer had fair notice that his conduct was unlawful. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)

(citation omitted). The relevant constitutional question must be framed with specificity and

granularity. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). The Supreme Court has

"repeatedly told courts not to define clearly established law at [that] high level of generality." *Id.*

(citing *Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011)). "Rather, the dispositive question is whether the

violative nature of particular conduct is clearly established." *Id.* (citing *Mullenix v. Luna*, 577 U.S. 7,

12 (2015)).

Plaintiff is unable to proffer a precedent that clearly establishes that the Officer Defendant's conduct was objectively unreasonable. Plaintiff cites *Campbell v. City of Indianola*, 117 F. Supp. 3d 854 (N.D. Miss. 2015), for the proposition that "[i]n the Fifth Circuit, '[i]t is beyond dispute that [a person's] right to be free from excessive force during an investigatory stop or arrest was clearly established in August 2007." (Resp. Officer Defs. Mot. Summary Judgment, Dkt. 139, at 28). But this is only a general statement of the rule and does not define Plaintiff's constitutional right with any degree of granularity. In *Campbell*, the court denied summary judgment when officers used a neck restraint on a plaintiff during an arrest without justification or provocation. *Campbell*, 117 F. Supp. 3d 854. The facts are far afield from the ones here—with a different weapon, protest circumstances, and the provocation from Plaintiff's water bottle throw.

Plaintiff also cites out-of-circuit cases. Out-of-circuit authority reaches the level of "clearly established" when it constitutes a "robust" consensus of circuit courts. *See e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). In *Morrow v. Meachum*, the Fifth Circuit noted that it had previously held that a law established in "six [different] circuits was insufficient to create a robust consensus." *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019). To prove that his right was clearly established, Plaintiff cites only cases from two different circuits. (Resp. Officer Defs. Mot. Summary Judgment, Dkt. 139, at 28) (citing *Ciminillo v. Streicher*, 434 F.3d 461, 461 (6th Cir. 2006), *Adams v. Metiva*, 31 F.3d 375, 385 (6th Cir. 1994), *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001), *Nelson v. City of Davis*, 685 F.3d 867, 872 (9th Cir. 2012)). Plaintiff's failure to proffer cases from a wide variety of circuits alone makes it unlikely that Plaintiff has met his burden.

What's more, these cases are not sufficiently similar to Plaintiff's to be instructive. Though the Sixth Circuit held in *Adams v. Metiva* that summary judgment was inappropriate because it remained disputed whether the plaintiff had committed a crime, whether he posed a threat, and

whether he was resisting arrest, those events did not occur during a protest where other individuals had thrown projectiles at the police—a key fact here. *See* 31 F.3d 375, 385 (6th Cir. 1994).

While *Ciminillo v. Streicher* is more on point, that case does not clearly establish the bounds of the constitutional right either. 434 F.3d 461 (6th Cir. 2006). There, Sixth Circuit reversed a grant of summary judgment in favor of qualified immunity for the officer when the officer had shot a protestor in the face with a beanbag "during the course of a riot." *Id.* at 463. The plaintiff alleged that, after he tried unsuccessfully to leave the riot, "he slowly walked towards the officers with his hands above his head." *Id.* After he advanced about ten feet, the officer shot him, "allegedly without provocation and at point blank range, in the chin and chest with a beanbag propellant." *Id.* Viewing the evidence in the light most favorable to the plaintiff, the Sixth Circuit found that the *Graham* test weighed against a finding of reasonableness. *Id.* at 467. Although the officer in *Ciminillo* used the same weapon as the Officer Defendants in similar riot or protest circumstances, the case is distinguishable because Ciminillo had done nothing to instigate police action. *Id.* at 467–468. Here, on the other hand, it is undisputed that Plaintiff had thrown a projectile at the Officer Defendants.

Plaintiff further contends that *Deorle v. Rutherford* clearly establishes that "less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use" and "when it is used, it should be preceded by a warning." (Resp. Officer Defs. Mot. Summary Judgment, Dkt. 139, at 29) (citing 272 F.3d 1272, 1118 (9th Cir. 2001)). Because the language comes from a training slide used by APD, the Officer Defendants "cannot avoid the clarity of clearly established law regarding the warning requirement." (*Id.*).

While the Court agrees that the case establishes a right to a warning "where feasible," *Doerle*, 272 F.3d at 110, one Ninth Circuit case does not sufficiently establish that right in the Fifth Circuit. Moreover, the plaintiff in that case "was unarmed, had not attacked or even touched anyone, had

generally obeyed the instructions given him by various police officers, and had not committed any serious offense." *Id.* at 1109. The police officer had simply fired when plaintiff reached a "predetermined" spot. *Id.* These facts are distinguishable from this case, where Plaintiff's throwing of a water bottle may have led a reasonable officer to believe that a warning was not feasible.

Finally, *Nelson v. City of Davis*, while occurring in protest-like conditions, suffers from the same deficiencies. In that case, officers responded to a party at U.C. Davis comprising approximately 1,000 people, with some overwhelming a police vehicle and throwing bottles at it. 685 F.3d 867, 872 (9th Cir. 2012). Officers arrived to disperse the scene. *Id.* at 873. The plaintiff alleged that police shot him as he "stood in the breezeway awaiting instructions." *Id.* at 874. The police "claim[ed] that they warned the congregants to disperse, but the students did not hear any commands until after shots had already been fired." *Id.* Unlike *Nelson*, where the plaintiff could only be accused of ignoring the police's dispersal order, Plaintiff had thrown an object at the Officer Defendants. Therefore, the circumstances are not sufficiently similar for *Nelson* to clearly establish Plaintiff's right.

The Court reiterates that Plaintiff's proffering of cases from two different circuits, in and of itself, falls short of the "robust consensus" necessary to establish Plaintiff's constitutional right. *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019). But even if this was enough to establish a right, key facts distinguish the cases from Plaintiff's case. The cases thus do not establish the right with a sufficient degree of granularity. *See Morrow*, 917 F.3d at 874.

For Supreme Court precedent, Plaintiff cites *Tennessee v. Garner*, arguing that it establishes that "[w]here [a] suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." (Resp. Officer Defs. Mot. Summ. J., Dkt. 139, at 29) (citing 471 U.S. 1, 8–9 (1985)). Both the Fifth Circuit

and the Supreme Court have cautioned litigants against relying on this general test. In *Morrow*, the

Fifth Circuit referred to the Sixth Circuit's citation of *Garner* as a catch-all for clearly established law

as a practice "infected by the same disease the Supreme Court cured in *Mullenix*." *Morrow v. Meachum*,

917 F.3d 870, 876 (5th Cir. 2019). *Mullenix* reiterated that the Supreme Court in *Brosseau* had already

held that the "use of *Garner*'s 'general' test for excessive force was 'mistaken.'" *Mullenix v. Luna*, 577

U.S. 7, 13 (2015) (citing *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 (2004)). Even though in *Mullenix*

the officer fired a rifle at a fleeing car, "[t]he general principle [from *Garner*] that deadly force

requires a sufficient threat hardly settles this matter." *Id.* (citing *Pasco v. Knoblauch*, 566 F.3d572, 580

(5th Cir. 2009)). The constitutional question that had to be "squarely governed" by a prior precedent

was instead framed by the Court as whether an officer could use deadly force to disable a vehicle

driven by a "reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular

flight, who twice during his flight had threatened to shoot police officers, and who was moments

away from encountering an officer at Cemetery Road [who was manning spike strips]." *Id.* at 13–14.

Similarly, here, Plaintiff cannot rely on the general law laid out in *Garner* to establish his right to be

free from excessive force in his specific circumstances. Accordingly, Plaintiff has not met his burden

of offering precedent that would have put an officer on notice that his actions were objectively

unreasonable.

More analogous Fifth Circuit precedent instead suggests that the Officer Defendants' force

was justified. In *Singleton v. Darby*, the Fifth Circuit held that a different form of intermediate force—

pepper spray—was "objectively reasonable" in response to protestors who were not acting violently

but might be soon. 609 Fed. Appx. 190, 192–93 (5th Cir. 2015). In that case, the Court concluded

that protestors on and around a truck could lead "a reasonable officer [to] believe[] that other

protestors might climb on the truck to attack the driver." *Id.*

Further, in *Hill v. Sheriff's Office Iberia Parish*, the Fifth Circuit affirmed a district court opinion that held that a crowd of 100 people who started throwing bottles and other objects at police officers qualified as a "tense, uncertain, and rapidly evolving situation"; that the officers' use of another form of intermediate force—tear gas—was "objectively reasonable;" and that the force used was "dependent in large part on the activities of the crowd, which was becoming increasingly more violent." No. CIV.A. 07-1607, 2009 WL 928080, at *1-2, 5 (W.D. La. Mar. 28, 2009), *aff'd sub nom. Hill v. Hebert*, 389 F. App'x 414 (5th Cir. 2010) (citing inter alia *United Steelworkers of Am. v. Milstead*, 705 F. Supp. 1426, 1441 (D. Ariz. 1988)) (holding officers' use of tear gas against people throwing objects at police did not violate the Fourteenth Amendment).

Although these opinions are unpublished, the Court finds that they are sufficiently similar to Plaintiff's case and that they would lead a reasonable officer to believe that their use of another form of intermediate force—beanbag rounds—to be objectively reasonable in light of the circumstances. The Court acknowledges that remaining factual disputes may distinguish this case from *Singleton* and *Hill*. But because Plaintiff has not offered precedent from the Fifth Circuit, Supreme Court, or a consensus of other circuits that would have put the Officer Defendants on notice as to the objective unreasonableness of their actions, the Court will grant Officer Defendants' motion for summary judgment on qualified-immunity grounds.

### C. The City's Motion for Summary Judgment

The City argues that Plaintiff's Section 1983 *Monell* claim fails because the Officer Defendants did not commit an underlying constitutional violation. As discussed above, a reasonable jury could find that the Officer Defendants committed constitutional violations against Plaintiff. The Court therefore turns to the remaining arguments against the City's liability: (1) the City's policies governing the use of less-lethal ammunitions was both constitutional as written and in practice; (2)

the City did not fail to train its officers in the use of less-lethal ammunitions; and (3) the City was

not negligent for failing to take expired or obsolete beanbag rounds out of circulation.

### 1. Section 1983

#### a. May 30 Beanbag Policy

A plaintiff bringing a *Monell* claim must prove (1) an official policy or custom, of which (2) a

policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation

whose "moving force" is that policy or custom. *Jauch v. Choctaw Cnty.*, 874 F.3d 425, 435 (5th Cir.

2017). An official policy generally takes one of two forms.

> (1) A policy statement, ordinance, regulation, or decision that is
> officially adopted and promulgated by the municipality's lawmaking
> officers or by an official to whom the lawmakers have delegated policy-
> making authority; or
>
> (2) A persistent, widespread practice of city officials or employees,
> which, although not authorized by officially adopted and promulgated
> policy, is so common and well settled as to constitute a custom that
> fairly represents municipal policy.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984); *see also Burge v. St. Tammany Par.*, 336 F.3d

363, 369 (5th Cir. 2003). A policy or custom is official "when it results from the decision or

acquiescence of the municipal officer or body with final policymaking authority over the subject of

the offending policy." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989); *Peterson v. City of

Fort Worth, Texas*, 588 F.3d 838, 847 (5th Cir. 2009). For "moving force," "a plaintiff must show that

the municipal action was taken with the requisite degree of culpability and must demonstrate a direct

causal link between the municipal action and the deprivation of federal rights." *Bd. of the County

Comm'rs v. Brown,* 520 U.S. 397, 404 (1997). That is, "the plaintiff must demonstrate that a municipal

decision reflects deliberate indifference to the risk that a violation of a particular constitutional or

statutory right will follow the decision." *Id.* at 411, 117 S.Ct. 1382. Deliberate indifference is a high

standard—"a showing of simple or even heightened negligence will not suffice." *Piotrowski v. City of Houston,* 237 F.3d 567, 579 (quoting *Bd. Of Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 387, 407 (1997)).

Plaintiff argues that both APD's written less-lethal-munitions policy and its implementation are unconstitutional, or at least that fact issues remain as to whether they are. (Resp. City's Mot. Summ. J., Dkt. 138, at 12). The Court disagrees. Plaintiff first argues that because APD General Order 206.5.3 authorizes the use of kinetic energy weapons any time a "subject" is throwing "dangerous projectiles" in a way that "create[es] a risk for injury," it encourages officers to ignore the specific circumstances at hand. (*Id.* at 13). However, Plaintiff ignores Policy 206.5.4, which provides additional factors:

> (a) Before discharging projectiles, the officer should consider the following factors:
> 1. The subject's capability to pose an imminent threat to the safety of officers or others.
> 2. Whether the subject is actively resisting arrest or attempting to evade arrest by flight.
> 3. The credibility of the subject's threat as evaluated by the officers present, and the subject's physical capacity/capability to carry out the threat.
> 4. The availability of other force options and their possible effectiveness.
> 5. Distance and angle to target.
> 6. Type of munitions employed.
> 7. Type and thickness of subject's clothing.
> 8. The subject's actions dictate the need for an immediate response and the use of control devices appears appropriate

(City's Reply Mot. Summ. J., Dkt. 2, at 2). APD's policy provides a comprehensive list of factors officers should consider before deploying less-lethal munitions. Therefore, Policy 206.5.3(c) does not eliminate the need for officers to evaluate the specific circumstances of each incident. Instead, it requires officers to first determine whether the subject is posing an imminent threat, the availability of other options, and other factors that encourage discretion. The policy does not give officers unbridled discretion to use less-lethal munitions without regard to whether the object was a

dangerous projectile. The Court therefore finds that Plaintiff has failed to raise a genuine fact issue as to the constitutionality of the written policy.

The Court finds that Plaintiff has also failed to meet his burden as to the constitutionality of APD's practices on May 30. Plaintiff argues that APD officers uniformly shot at anyone who threw anything, without regard to (1) whether the item was a "dangerous projectile"; or (2) whether the item was in the process of being thrown or had already been thrown. (Resp. City's Mot. Summ. J., Dkt. 138, at 14). Plaintiff contends because another officer would call out descriptions of individuals throwing objects, it leaves open the "possibility" that an officer may have deployed weapons without witnessing a precipitating act. (*Id.*). Because this practice was "pervasive," "it was undoubtedly Austin Police Department policy." (*Id.*).

The evidence suggests otherwise. Each officer deposed testified that they did not deploy less-lethal munitions unless they first saw an individual throw an object. (Reply City's Mot. Summ. J., Dkt. 151, at 3). The officers described the variety of objects that they saw being thrown at officers including rocks, bricks, frozen water bottles, bottles filled with urine and bleach, fireworks and other incendiary devices and explained why these objects presented a serious risk of bodily injury. (*Id.*). Because the officers have testified to witnessing precipitating acts, and because Plaintiff can point to only isolated instances where officers may have disregarded official APD policy, Plaintiff cannot establish that APD had an official policy or custom of shooting protestors indiscriminately.

Plaintiff also argues that Chief Manley ratified the custom when he announced that officers' use of beanbag rounds during the protests complied with APD policy. (Resp. Mot. Summ. J., Dkt. 138, at 15). Plaintiff cites *Grandstaff v. City of Borger* for the proposition that "subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy." (*Id.* (quoting 767 F.2d 161, 171 (5th Cir. 1985)). In that case, police officers opened fire on a

landowner after the police engaged in a high-speed chase with a suspect who drove onto the landowner's ranch. The officers "poured" gunfire into the landowner's truck and killed the landowner without any evidence suggesting that he was the suspect involved in the high-speed chase. *Id.* The Fifth Circuit characterized the actions of the officers and supervisors as an "incompetent and catastrophic performance, there were no reprimands, no discharges, and no admissions of error." *Id.* at 171. The Fifth Circuit held that the city could be liable under § 1983, noting that if an "episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger." *Id.* Here, the officers' actions—shooting a protestor after he had unquestionably thrown an object at them—do not reach the level of "dangerous recklessness" present in *Grandstaff.* Plaintiffs are therefore unable to rely on a ratification theory to support their claims against the City.

Finally, Plaintiffs argue that APD was deliberately indifferent to the known or obvious consequences of their policy or practice. (Resp. Mot. Summ. J., Dkt. 138, at 15 (citing *De Luna v. Hidalgo Cnty.*, 853 F. Supp. 2d 623, 641 (S.D. Tex. 2012)). Plaintiff relies on Chief Manley's knowledge that police officers had shot peaceful protestors, sometimes causing severe injuries, and allowed these practices to continue for at least two days. (*Id.* at 16). First, as discussed above, the Court finds that APD did not have a policy of shooting protestors who threw items without regard to the threat they posed. Second, Manley testified that on the Monday or Tuesday following the May 30–31 protests, APD leadership prohibited the use of less-lethal munitions in a crowd after APD learned of injuries. (*Id.*). The fact that the City took two or three days to respond to complex and evolving conditions at most demonstrates a degree of negligence, which does not suffice to demonstrate deliberate indifference. *Cf. Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997). The

City's willingness to reform its less-lethal munitions policy demonstrates that its actions fall short of the deliberate-indifference standard.

### ii. Police Officer Formation

Plaintiff also asserts that APD's "practice of arranging the officers" "hemm[ed] in protestors" and resulted in "dangerous use of kinetic energy weapons." (Resp. City's Mot. Summ. J., Dkt. 138, at 17). On the day of the protest, APD stationed approximately two to three hundred police officers outside police headquarters. (*Id.*). APD ordered its officers to form two lines—one in front of headquarters and the other on the I-35 overpass looking down at the intersection below. (*Id.*). APD distributed all of its kinetic energy shotguns—somewhere between 50 and 100 weapons—for use against protesters. (*Id.*). Plaintiff argues APD's practice of stationing officers on the bridge without regard to the distance or angle from which they would shoot at protestors "likely affected their accuracy." (*Id.*).

The Court does not find this policy to be the moving force behind Plaintiff's injuries because it does not reflect deliberate indifference. *See Valle v. City of Houston*, 613 F.3d 536, 546 (5th Cir. 2010). APD reasonably placed officers in front of the police station to protect it and on the overpass to monitor the crowd. APD had no way of knowing where the crowd would form or where it would move to. It could not have predicted the distances that the officers would be shooting from. The City's weighing of the risk of diminished accuracy and the need to monitor an ongoing protest does not reflect deliberate indifference.

### b. Failure to Train

Plaintiff also asserts that the City violated his constitutional rights under a failure-to-train theory. To defeat summary judgment on a failure-to-train theory, Plaintiff must show that a fact issue exists as to each of the following elements of the claim: "(1) that the municipality's training

procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question." *Ybarra v. Davis*, 489 F. Supp. 3d 624, 634 (W.D. Tex. 2020). Plaintiff can show deliberate indifference in one of two ways: "(1) demonstrate a pattern of violations fairly similar to what ultimately transpired in the instant case, or (2) demonstrate that 'single-incident' liability exists because it was highly predictable that a constitutional violation would result from a particular failure to train." *Dawes v. City of Dallas*, No. 3:17-cv-1424-X-BK, 2021 WL 1200229, at *4 (N.D. Tex. March 12, 2021), *report and recommendation adopted sub nom.*, No. 3:17-CV-1424-X-BK, 2021 WL 1192222 (N.D. Tex. March 30, 2021). The plaintiff must show that the training was so inadequate that it would pose a "patently obvious risk of recurring constitutional violations." *Kitchen*, 759 F.3d at 485.

Rather than argue that the City had notice of a pattern of prior violations, Plaintiff argues that single-incident liability exists because it was highly predictable that excessive force violations would result from the City's failure to train its officers to safely fire the kinetic energy shotguns. (Resp. City's Mot. Summ. J., Dkt. 138, at 18). Specifically, the officers' training failed to help them "differentiate between primary and secondary target areas." (*Id.*). To qualify to wield a shotgun loaded with kinetic energy projectiles, a cadet must shoot at a target labeled with red, green, and yellow zones from two different distances: 40 feet and 20 feet. (*Id.*). Although only a hit in the green area passed at 20 feet, from 40 feet away, both green and yellow hits passed. (*Id.*). Moreover, General Order 206.5.5 stated that, other than the head and neck, "any target area or distance may be considered when it reasonably appears necessary to accomplish immediate incapacitation in order to prevent serious injury or death to officers or others." (*Id.*).

Plaintiffs argue that this training led to an obvious risk that a violation would occur. Indeed, multiple officers' comments suggested that they were confused between the green and yellow zones.

(*Id.* at 19–20, 22). The Officer Defendants also shot Plaintiff twice in the red zone (ear and groin)—an area reserved only for when an officer intends to use deadly force. (*Id.* at 20).

Plaintiff goes on to argue that officers failed to recognize the beanbag rounds' effective distance of 50 feet or its maximum effective distance of 75 feet. (*Id.*). When questioned, Officer Defendants knew neither the distance from which they were firing on May 30, 2020 nor the maximum effective distance of the rounds they were firing. (*Id.*). The Officer Defendants shot Plaintiff from approximately 65 to 80 feet away—nearly double the maximum distance they trained (40 feet), in excess of the 50-foot effective distance, and in some cases beyond the manufacturer's 75-foot maximum effective distance for the rounds. (*Id.*). According to Plaintiff, "[t]raining police officers at closer distances is inadequate when those same police officers are directed to fire on people from much longer distances." (*Id.*).

Plaintiff further argues that the officers had limited experience wielding the weapons. To achieve certification, an Austin police academy cadet needed only two passing hits at each target distance (20 and 40 feet). (*Id.*). After that, an officer needed only to fire four rounds per year under the same conditions (two passing hits at 20 and 40 feet) to continue to "qualify" on the weapon. (*Id.*). Further, some Officer Defendants skipped qualification in 2020 due to COVID-19. (*Id.*). The training and qualification shots were also taken straight on at stationary targets, not at moving targets or with shooting the beanbag munitions downward. (*Id.*).

The Court finds that Plaintiff has failed to establish a genuine fact issue as to whether the training posed "patently obvious risk of recurring constitutional violations." *See Kitchen*, 759 F.3d at 485. "Cadets receive four hours of training on the shotguns," which includes "classroom instruction on a number of learning objectives including effective ranges, target areas and risks as well as an evaluation phase at the firearms range for qualification which includes feedback from the

instructors." (City's Reply Mot. Summ. J., Dkt. 151, at 6). APD trains its officers to differentiate between different target zones and gives them practical training that differentiates between the target zones, at least at closer distances. APD also requires officers to recertify every year by demonstrating that they understand how to shoot the weapons. Plaintiff cites no comparative evidence from other law enforcement agencies demonstrating how APD's training is inadequate and provides no expert testimony explaining how APD's less-lethal shotgun training is inadequate. Plaintiff also has not demonstrated how any other incidents would have put the City on notice of a need for specific or altered training. Plaintiff also has not produced evidence why different training procedures should have been obvious to the City. The fact that some officers misremembered details from their training does not demonstrate that the training was constitutionally deficient. The training—even if imperfect—does not reflect a patently obvious risk that a violation would occur.

Finally, Plaintiffs argue that APD's reviews and analyses of the May 2020 protests create a fact question as to deliberate indifference. (Resp. City's Mot. Summ. J., Dkt. 138, at 22–23). The Special Response Team presentation does suggest that better training could be offered but does not specify any details to suggest that APD's less-lethal shotgun training was inadequate in the first place or that APD was deliberately indifferent to the need for improvements in training. (City's Reply Mot. Summ. J., Dkt. 151, at 8). The fact that APD found ways to improve its training after the protests does not suggest that its previous training was inadequate or that it was deliberately indifferent to any obvious risks that would occur as a result.

## 2. Negligence

Plaintiff alleges that the City negligently exacerbated Plaintiff's injuries by using expired or poorly maintained munitions that it failed to take out of circulation. (Resp. City's Mot. Summ. J., Dkt. 138, at 24). In response, the City argues that Plaintiff has not presented any evidence to

support his claims that the beanbags that hit him were expired, or that they caused any damages beyond those that would have been caused by unexpired munitions." (City's Reply, Dkt. 151, at 9).[3]

Plaintiff offers some evidence that indicates the Officer Defendants could have used expired or obsolete munitions at the May 30 protest. The City's corporate representative explained that the same rounds circulate indefinitely until used without being taken out of circulation when expired. (Resp. City's Mot. Summ. J., Dkt. 138, at 8–9). APD does not track expiration dates or evaluate munitions for damage or degradation. (*Id.* at 26). An officer explained that in 2020, some of the munitions were three years further into or past their five-year shelf life. (*Id.*). Boxes containing beanbag rounds were labeled with a manufacture date of 2007, while others were labeled 2003. (*Id.*). Those boxes' original contents would have been "way outside of the expiration date of five years," though Plaintiff concedes that they could have contained "newer rounds that had been later placed inside them for storage." (*Id.*). The evidence also suggests that the City knew of at least one severe penetrating incident with a beanbag round in January 2020 and failed to take action to prevent further similar incidents. (*Id.* at 25).

Furthermore, some evidence suggests that the Officer Defendants may have used an older, non-stabilized version of munitions that is less accurate and more likely to exacerbate injuries. (*Id.* at 25–26). First, Plaintiff suffered injuries that could have come from the older munitions. (*Id.*). The older munitions were square canvas bags folded in half and inserted into the husk of a shotgun shell. (*Id.* at 25). The bag opens up and acted like a sail, distorting accuracy. (*Id.*). After those rounds age, they cease opening up, causing problems like lacerations, like the ones Plaintiff faced, broken bones, and penetrations. (*Id.* at 26). Second, weeks after the protest, a corporal found a hardened, non-

---

[3] The City also argues that it is immune from liability under the Texas Tort Claims Act. (City's Mot. Summ. J., Dkt. 130, at 26). Because the Court grants the City's motion on other grounds, it declines to address these arguments.

stabilized beanbag round in the property control office at the main police station, which had been collected from officers during APD's transition to a different brand of munitions. (*Id.*). Plaintiff argues that this evidence is enough to show that he was hit by expired or poorly maintained rounds.

The Court finds this evidence insufficient to raise a genuine issue of material fact.[4] Chief Manley has testified that APD was not able to determine that the rounds had expired, (City's Reply Mot. Summ. J., Dkt. 151, at 10), and Plaintiff's evidence fails to suggest otherwise. Plaintiff's injuries imply only that his injuries *could* have come from obsolete munitions. He never claims that his injuries are of the kind caused only by deficient rounds, or even that they are more likely to have come from deficient rounds. Nothing suggests that the injuries were caused by anything but unexpired, up-to-date rounds.

Though Plaintiff offers some other evidence suggesting expired rounds may have been in circulation, this evidence at most suggests that the Officer Defendants may have had access to them. Given the sheer number of police officers deployed at the protests, the multiple days the protests lasted, and the number of beanbag incidents that may have occurred, this evidence fails to help

---

[4] It is unclear to the Court whether the City means to motion for dismissal or summary judgment of Plaintiff's negligence claims. The entire motion is styled as a motion for summary judgment, (*see generally* City's Mot. Summ. J., Dkt. 130), but its negligence section asks for "dismissal" of the Plaintiff's claim and cites the standard for a motion to dismiss under Federal Rule of Procedure 12(b)(6), (*id.* at 25–26). Plaintiff certainly assumes that the City has moved for dismissal. He urges the Court to assume all the allegations in its complaint are true, including his assertion that "[u]pon information and belief," he "sustained more serious injuries, harm, and damage because the projectiles the expired munitions [sic] had hardened." (Resp. City's Mot. Summ. J., Dkt. 138, at 24). The City's reply is more ambiguous than their motion as to whether it seeks dismissal or summary judgment. Though the City continues to urge dismissal, it disputes whether Plaintiffs have evidence to support their assertions. (City's Reply Mot. Summ. J., Dkt. 151, at 9–10). This is more appropriate for a summary-judgment motion than a motion to dismiss, for which courts must assume a plaintiff's factual allegations are true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Because the reply calls into question Plaintiff's evidence, discovery has closed, and the entire motion is styled as a motion for summary judgment, the Court will assume that the City has asked for summary judgment on Plaintiff's negligence claims. Accordingly, it will look at the evidence to decide whether there is a genuine dispute of material fact. *See* Fed. R. Civ. P. 56.

Plaintiff raise a genuine fact issue. Accordingly, the Court grants the motion for summary judgment as to Plaintiff's negligence claims.

## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that the City's Motion for Summary Judgment, (Dkt. 130), is **GRANTED**, and Motion to Strike Plaintiff's Summary Judgment Evidence, (Dkt. 146), is **DENIED**. **IT IS FURTHER ORDERED** that the Officer Defendants' Motion for Summary Judgment, (Dkt. 132), is **GRANTED**. **IT IS FINALLY ORDERED** that the Officer Defendants' joint motion to consolidate this case with Cause No. 1:21-cv-1087 for trial, (Dkt. 163), is **MOOT**.

**SIGNED** on December 17, 2024.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE